**U**NITED **S**TATES **D**ISTRICT **C**OURT
**M**IDDLE **D**ISTRICT **O**F **F**LORIDA
**O**RLANDO **D**IVISION

**HECTOR MADRIGAL,**

    **Plaintiff,**

**v.**                                                                                               **Case No:   6:13-cv-575-Orl-31GJK**

**PROGRESS ENERGY SERVICE**
**COMPANY, LLC and LIBERTY LIFE**
**ASSURANCE COMPANY OF BOSTON,**

    **Defendants.**

## **O**RDER

This matter is before the Court on the parties' cross motions for summary judgment and responsive memoranda.[1]

**I.**    **Background**

In this case the Plaintiff is seeking this Court's determination that he was entitled to long term disability ("LTD") benefits under the terms of the Progress Energy Service Company, LLC's ("Progress") LTD plan ("LTD Plan"). The claim was brought under the Employee Retirement Income Security Act ("ERISA"), as amended 29 U.S.C. §§ 1001, *et seq*. The Plaintiff, who suffers from long-term back problems, was a senior customer service representative ("CSR") for Progress who operated out of a call center. Based on the description from Progress, Plaintiff's CSR job

---

[1] The operative pleadings include the Plaintiff's Motion for Summary Judgment (Doc. 28) ("Plaintiff's Motion"), the Defendants' Response in Opposition (Doc. 34) ("Opposition to Plaintiff's Motion"), and Reply in Support of Plaintiff's Motion (Doc. 36) ("Support of Plaintiff's Motion")— on the other side is Defendants' Motion for Summary Judgment (Doc. 30) ("Defendants' Motion"), the Plaintiff's Response in Opposition (Doc. 33) ("Opposition to Plaintiff's Motion"), and the Defendants' Reply in Support of Defendants' Motion (Doc. 35) ("Support of Defendants' Motion").

required exactly what one would expect of a telephone representative—to answer calls from customers and resolve customer service issues. Towards the end of 2011 he sought medical treatment to ease his back pain, which included minimally invasive surgical procedures. (R. at 175, 177). Following the procedures, Madrigal sought short term disability ("STD") pay, which was approved January 19, 2012. Liberty Life Assurance Company of Boston ("Liberty") was designated as the Plan Administrator and provided the review of the Plaintiff's medical records and appears to have made the decisions regarding the Plaintiff's STD and LTD eligibility.[2]

Following the Plaintiff's medical procedures he reported improvement in pain to his physicians. (R. at 210 (noting that his pain had decreased from prior to the date of the surgical procedures); R. at 494 (Plaintiff reported a 40% decrease in pain following procedures)). Madrigal continued to see several doctors over the first part of 2012 and during this time sought medication and physical therapy for his pain. He was ultimately approved for STD benefits for the total available time under the STD plan, up to June 17, 2012.

As the STD period was nearing its end, Madrigal sought LTD benefits. Rose Rains, a Liberty Disability Case Manager, was charged with reviewing Plaintiff's LTD application. Part of this review consisted of procuring an independent peer review of the Plaintiff's medical records. (*See* R. at 489-96). Ultimately she determined that LTD benefits were not payable, and denied the claim. (R. at 507-10). Following the initial denial of the LTD benefits, the Plaintiff appealed the decision, and Liberty, now through Chuck Jonson an Appeal Unit Consultant with Liberty, reviewed the file.

---

[2] The Plaintiff contends that Liberty was not fully delegated authority to make final eligibility determinations and that Progress ultimately made the decision. Whether Liberty was delegated final authority would have an impact on the standard of review in this case if it were necessary to proceed past the first stage of review. However, because the Court can decide this case based on a *de novo* review alone, it is unnecessary to delve into whether Liberty or Progress ultimately made the final LTD decision. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

(*See* R. at 597). Jonson arranged for another peer review, and reached the same ultimate conclusion, that the Plaintiff had some physical limitations, but those limitations would not prevent him from performing his CSR job, which was predominantly sedentary in nature. (R. at 597-602).

Plaintiff now seeks a determination that the denial of LTD benefits was wrong. Defendants, on the other hand, assert that the denial was correct and should be affirmed.

**II.     Standard**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324–25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations

unsupported by facts. *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 458–59 (11th Cir.1994).

ERISA does not set out the standards by which a court is to review a plan administrator's decision to deny benefits. *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 109 (1989). The Eleventh Circuit, however, has set out a six-step framework by which to review a denial of benefits:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

### III. Analysis

The Court must first determine whether the denial was wrong based on the records before the administrator. *Id.* at 1354 (citing *Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1140 (11th Cir. 1989)) (review of an ERISA decision is "limited to consideration of the material available to the administrator at the time it made its decision"). The analysis begins with the applicable definitions under the LTD Plan:

> The definition of total disability is based on the length of the disability. During the six-month waiting period and the first 12 months that benefits are payable, **total disability is defined as your inability to perform the essential functions or duties of your regular occupation or a reasonable employment option offered to you by your employer due to a medical condition** (accidental injury, sickness, or mental illness) as defined in the LTD Definitions section below. After 18 months, total disability is defined as your inability to perform the essential functions of any gainful occupation (as defined in the LTD Definitions section below) for which you are qualified, or could become qualified to do, based on your education, training and experience.

(R. at 6 (emphasis added)). Simply put, if the medical records demonstrate that the Plaintiff was totally disabled, that is to say he could not perform his essential CSR functions, then he was entitled to LTD benefits under the LTD Plan. Accordingly, the next question is: What were the Plaintiff's "essential functions" as a CSR?

The Plaintiff's former CSR duties are described by Progress as:

> This position is required to be at their work station for long durations, with scheduled breaks and lunch times. [CSRs] take upwards of 80 calls per day and are closely monitored on a continual basis. The [CSR] must be able to quickly multi-task to hear the customer/caller, speak with caller, read the monitor and type all at the same time.

(R. at 122, 607 (the document cited in the Record is the "Job Worksheet")). The Job Worksheet makes clear that a CSR must be at a computer terminal and be able to interact with customers over the telephone and enter and retrieve data from a computer system—that is essentially what a CSR does. The Job Worksheet also has a list of activities and a space to indicate how long, per day, the

employee performs certain tasks such as sitting, standing, or walking—the form indicates that a CSR sits between 7 and 7.5 hours per day. (*Id.*).

The Plaintiff's principle argument is that he is unable to sit for 7 to 7.5 hours, which he contends is an "essential function" of his CSR job. (Doc. 28 at 3). While the LTD Plan does not define "essential functions," common sense and applicable dictionary definitions[3] demonstrate that sitting is neither essential nor a function of the job. According to the Job Worksheet, a typical CSR may, in fact, sit for the majority of his or her workday, but it is not required. A CSR need not sit, stand, recline, or otherwise orient their body in a particular manner, so long as he or she can access a computer at a workstation and take calls. Accordingly, the Plaintiff's argument that he was disabled under the LTD Plan because he could not sit for 7 to 7.5 hours a day is unavailing. Further, Maritza Caro, an interim manager for Progress, plainly stated that Plaintiff would be able to shift positions from sitting to standing during the course of the day. (R. at 497-98).

The other information that was before Ms. Raines at the time of first denial consisted of medical documentation that principally originated from Dr. Morris of the Laser Spine Institute; PA-C Lindsey Repass[4] and Dr. Krupitsky of the Altamonte Family Practice; and Dr. Esmailzadeh of Advanta Care. While there were others, these individuals appear to be the most involved in the Plaintiff's care during the relevant period. (*See* R. at 507-08 (listing medical information relied on

---

[3] The term "essential" is defined in relevant part as "of, relating to, or constituting essence" and "of the utmost importance." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/essential (last visited 5/5/2014). The term "function" is defined in relevant part as "profession or official position," or "the action for which a person or thing is specially fitted or used or for which a thing exists." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/function (last visited 5/5/2014).

[4] Lindsey Repass's legal name was Lindsey Wolf as of February 26, 2013. (R. at 908). However, she is referred to throughout most of the Record by her former surname, accordingly the Court will refer to her by the name predominantly used in the Record.

in LTD determination and included in the Record)). Raines enlisted Dr. Mark Kaplan to perform a peer review of the medical records to assist her analysis of the Plaintiff's condition. (R. at 489-96). Ultimately, Dr. Kaplan concluded that the Plaintiff had certain restrictions, these included: lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; pushing and pulling up to 20 pounds occasionally and 10 pounds frequently; occasional reaching overhead; being allowed to change positions as needed. (R. at 495). This is consistent with multiple findings from other treating physicians who generally recommended the Plaintiff be limited to predominantly sedentary work and allowing for limited lifting.[5] Raines ultimately concluded that LTD benefits were not due—she was not wrong.

Following the denial of the LTD Benefits by Raines, the Plaintiff appealed the decision, and the file was handled by Chuck Jonson, an Appeal Unit Consultant with Liberty. (*See* R. at 596). Plaintiff's file was then referred to Dr. Jamie L. Lewis for further peer review who also determined that Plaintiff would be able to work, subject to some lifting and carrying restrictions. (R. at 600, 907-13). Jonson also determined that the Plaintiff was not entitled to LTD Benefits.

While the record is clear that the Plaintiff did experience pain and incurred certain work related limitations, none of those restrictions made him unable to perform the essential functions of his CSR job. Further, it is clear from the record that the Plaintiff's former job did not mandate he sit for 7 to 7.5 hours per day. Although CSRs at Progress typically did sit for that amount of time, they were not required to do so, and the Plaintiff could have performed his job and shifted positions between sitting and standing.

---

[5] Some example of restrictions noted early in 2012 include: January 20, 2012 Dr. Morris recommended sedentary work up to six weeks post-op, and light work up to twelve weeks post-op (R. at 162); January 27, 2012 PA-C Repass notes that Plaintiff is restricted to sedentary work, and is able to stand occasionally and sit frequently (R. at 204).

It is therefore,

**ORDERED** that the Plaintiff's Motion for Summary Judgment (Doc. 28) is **DENIED** and the Defendants' Motion for Summary Judgment (Doc. 30) is **GRANTED**. The Clerk is directed to enter judgment in favor of the Defendants and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 9, 2014.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party